# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 09-1862

_____

| | | |
|---|---|---|
| Mack Langford; John Hardin, | * | |
| | * | |
| Appellees, | * | |
| | * | |
| v. | * | |
| | * | |
| Larry B. Norris, former Director | * | |
| of the Arkansas Department of | * | |
| Correction; John Byus, Administrator | * | |
| for Medical Services for the Arkansas | * | |
| Department of Correction; Max | * | Appeals from the United States |
| Mobley, former Deputy Director for | * | District Court for the |
| Health and Correctional Programs | * | Eastern District of Arkansas |
| for the Arkansas Department of | * | |
| Correction; Wendy Kelley, Deputy | * | |
| Director for Health and Correctional | * | |
| Programs for the Arkansas Department | * | |
| of Correction; Marvin Evans, | * | |
| | * | |
| Appellants. | * | |

_____

No. 09-1865

_____

| | | |
|---|---|---|
| Mack Langford; John Hardin, | * | |
| | * | |
| Appellees, | * | |
| | * | |
| v. | * | |

Dr. Nnamdi Ifediora; Correctional  *
Medical Services, Inc.,     *
             *
     Appellants.   *

_____

Submitted: January 14, 2010
Filed: July 20, 2010

_____

Before GRUENDER and SHEPHERD, Circuit Judges, and LANGE,[1] District Judge.

_____

GRUENDER, Circuit Judge.

Mack Langford and John Hardin, inmates at the Randall L. Williams Correctional Facility in Arkansas, filed this lawsuit under 42 U.S.C. § 1983 against various defendants, including several current and former Arkansas Department of Correction officials, the company that provides medical services in Arkansas prisons, and a prison doctor. The plaintiffs allege, among other things, that the defendants violated the Eighth Amendment by acting with deliberate indifference to their serious medical needs. The defendants moved for summary judgment on most of the plaintiffs' claims, and the district court granted the motions in part and denied the motions in part. Some but not all of the defendants have appealed the denial of summary judgment on the remaining claims against them. We dismiss in part for lack of jurisdiction, affirm in part, and reverse in part.

_____

[1]The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota, sitting by designation.

-2-

## I.    BACKGROUND

The indispensable substantive and procedural facts are as follows. Mack Langford is in his early eighties and has been incarcerated since 1997. Langford suffers from a variety of physical maladies and shows signs of mild mental retardation and dementia. The crux of Langford's factual allegations is that he has complained for years of stomach and back pain, among other ailments, yet his infirmities have not been adequately treated.

Langford points to two incidents in which his condition was allowed to deteriorate until emergency medical intervention was required. The first happened in April 2003. Langford alleges that he had complained repeatedly of severe stomach pain, vomiting blood, and other symptoms, yet medical personnel at the prison chalked these up to "gas" and gave him antacid tablets. Eventually, Langford passed out in the prison barracks and was rushed to a local hospital. At the hospital, doctors discovered a problem with Langford's gallbladder, which might later have been removed (the record is not clear), and found cysts in both his kidneys.

After Langford was released from the hospital the first time, he continued to complain periodically of stomach and back pain. Starting in November 2004, Langford was examined at least sixteen times by Dr. Nnamdi Ifediora, an employee or contractor of Correctional Medical Services, Inc. ("CMS"), the company that provides medical services in Arkansas prisons. Dr. Ifediora at times referred Langford to specialists, from whom he sought diagnostic recommendations. Imaging tests performed in August 2005 revealed a possible mass in one of Langford's kidneys and cysts in both kidneys.

The second incident requiring emergency intervention happened in November 2005. Langford alleges that on November 28, 2005, he again complained of stomach pain and again did not receive adequate treatment until he passed out and was rushed

to the hospital. There, doctors diagnosed Langford with pancreatitis and again found cysts in both his kidneys. Langford claims that he still has not received adequate treatment for these cysts or for "possible renal failure."

The record shows that Langford filed many grievances about his medical needs and the alleged inadequacy of the corresponding treatment, starting as early as May 2003. In at least one instance, Langford went outside the prison's official grievance procedure by sending a letter to John Byus, Administrator for Medical Services for the Department of Correction. Byus has not produced Langford's letter, so its contents are uncertain. The record does, however, contain a series of e-mails that Byus received on July 26 and July 27, 2005 (apparently sent by Department of Correction or CMS employees), summarizing Langford's most recent medical problems and how those problems had been dealt with. The record also contains a letter from Byus to Langford, dated August 11, 2005, which refers to a letter from Langford, dated July 20, 2005, on the subject of "competent medical staff." In his August 11 letter, Byus instructs Langford to "refer to the informal resolution and grievance process for future concerns and/or complaints." Byus concludes the letter by stating that "[a]ll documentation will be forwarded to the Health Service Administrator and Regional Health Administrator, advising them to address situation [sic] and inform you of findings either by written correspondence or interview." It is not clear whether Langford received the promised response.

Langford's co-plaintiff, John Hardin, is sixty-six years old and has been incarcerated since 1996. Hardin has insulin-dependent diabetes that is not well controlled. The crux of Hardin's factual allegations is that a lapse in treatment following surgery for a broken ankle caused, or perhaps merely exacerbated the effects of, a condition called "Charcot foot."[2]

---

[2]An online reference page about Charcot foot, published by the American College of Foot and Ankle Surgeons and included in the record, describes the condition as "a sudden softening of the bones in the foot that can occur in people who

-4-

Hardin fell and broke his ankle in February 2004. Dr. John Lytle, an orthopedic surgeon in private practice who occasionally treats prisoners, performed surgery on the injured ankle. Hardin had several routine follow-up visits with Dr. Lytle, the last of which was in May 2004. After that visit, Hardin began complaining of severe pain in his surgically repaired ankle.

Hardin alleges that in July 2004, a doctor in the prison infirmary told him that "there was something seriously wrong" with his ankle, which had become "misshapen and deformed." In September 2004, Hardin saw Dr. Ifediora, who noted the deformity in Hardin's ankle as well as Hardin's pain and difficulty walking. Dr. Ifediora ordered a wheelchair for Hardin and referred him for an "orthopedic consult" with Dr. Lytle. Hardin alleges that he was initially prescribed a wheelchair in February 2004 but did not receive one until Dr. Ifediora made this redundant prescription, seven months later.

In October 2004, Hardin saw Dr. Lytle, who diagnosed him with Charcot foot. Dr. Lytle observed that Hardin's bones showed "significant deterioration" and that reconstructive surgery might not be an option. Based on these observations, Dr. Lytle suggested that amputating Hardin's leg below the knee might give him the best chance to regain mobility. After receiving this dispiriting news, Hardin continued to complain periodically about pain and the deformity in his ankle.

In February 2005, Hardin saw Dr. Lytle for the last time. Dr. Lytle noted his concerns about the "progressive deformity" in Hardin's ankle and about Hardin's inability to bear weight on the injured leg. Dr. Lytle prescribed a padded tennis shoe and a cane, and suggested that Hardin might need a brace for his foot. Hardin alleges

have significant nerve damage (neuropathy). The bones are weakened enough to fracture, and with continued walking the foot eventually changes shape. As the disorder progresses, the arch collapses and the foot takes on a convex shape, giving it a rocker-bottom appearance, making it very difficult to walk."

that he still has not received a brace or a padded shoe that fits properly. Moreover, Hardin claims that he is now "wheelchair bound" and says that he has not been offered any other treatment options.

The record shows that Hardin filed many grievances about his medical needs and the alleged inadequacy of the corresponding treatment, starting as early as August 2004. Like his co-plaintiff, Hardin also went outside the prison's official grievance procedure by sending a letter to Byus. And Byus has again produced his reply but not the letter that prompted him to write it. The letter from Byus to Hardin is dated October 26, 2004, and refers to a letter from Hardin, dated October 15, 2004, on the subject of "injury to right ankle and request to see Orthopedic Specialist." Byus wrote that "[b]y copy of this letter, I am advising the Health Services Administrator to look into this matter and communicate findings to you either by interview or written correspondence." It is not clear whether Hardin received the promised response.

The plaintiffs brought this action under 42 U.S.C. § 1983 against two principal sets of defendants. The first set consists of current and former Department of Correction officials: namely, Larry Norris, the former Director of the Department of Correction; John Byus, whom we have already introduced; and Max Mobley, the former Deputy Director for Health and Correctional Programs (hereinafter, "the state defendants"). The second set of defendants consists of CMS and Dr. Ifediora (hereinafter, "the medical defendants").[3] The plaintiffs' amended complaint alleges

---

[3]While there are other defendants with active claims against them, we omit them from our discussion (as we have omitted some from the caption), either because they have not appealed, or because addressing their role in the litigation is not necessary for us to resolve this appeal, or for both of those reasons. We note that Wendy Kelley, the current Deputy Director for Health and Correctional Programs, and Marvin Evans, whose title is nowhere to be found in the briefs, appeal only the denial of summary judgment "on the issue of failure to exhaust," which, as we explain below, we lack jurisdiction to review. None of the parties' arguments focus specifically on Kelley or Evans, both of whom apparently have been sued only in their official capacities.

that both the state defendants and the medical defendants acted with deliberate indifference to their serious medical needs, in violation of the Eighth Amendment's prohibition on cruel and unusual punishments. In addition, the complaint alleges that the defendants deprived them of their rights to due process and equal protection under the Fourteenth Amendment and violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act. The complaint also includes state law claims of negligence and intentional infliction of emotional distress, otherwise known as the "tort of outrage."

The state defendants and the medical defendants moved for summary judgment on most of the plaintiffs' claims. Three components of these motions deserve special attention. First, both sets of defendants argued that Langford and Hardin had failed to exhaust administrative remedies under the Prison Litigation Reform Act, a statute requiring inmates to exhaust available administrative remedies before filing suit to challenge the conditions of their confinement. *See* 42 U.S.C. § 1997e(a). Second, regarding the plaintiffs' deliberate indifference claims, the state defendants sought qualified immunity as a shield against civil damages, asserting that their conduct had not violated Langford's or Hardin's clearly established constitutional rights. *See Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). Third, also regarding the plaintiffs' deliberate indifference claims, both sets of defendants professed that there was no genuine issue as to any material fact and that they were entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

Since the bulk of our opinion deals with claims against Norris, Byus, and Mobley in their individual capacities, we have omitted Kelley and Evans from our definition of the "state defendants." This terminological choice has no substantive effect on our analysis (and it certainly does not mean that we have ignored Kelley's and Evans's participation in this appeal), but it might help to avoid unnecessary confusion when we reach the merits of the relevant claims. Hereafter, when we use the term "the defendants," we are referring only to "the state defendants" and "the medical defendants," as we have defined those groups.

The district court, adopting the magistrate judge's proposed findings and recommendations, granted the motions in part and denied the motions in part. In particular, the court rejected the defendants' arguments that the plaintiffs had failed to exhaust administrative remedies on their deliberate indifference claims, finding that Hardin had exhausted available remedies and that there was a genuine issue of material fact about whether Langford had exhausted available remedies. The court also rejected the state defendants' qualified immunity defense, stating in generic terms that "the plaintiffs' constitutional rights to adequate medical care and treatment [were] clearly established." And the court found that there were genuine issues of material fact concerning the plaintiffs' deliberate indifference claims, but only to the extent those claims were premised on certain allegations: specifically, Langford's allegation that Dr. Ifediora acted with deliberate indifference to his serious medical needs; Hardin's allegation that CMS acted with deliberate indifference to his serious medical needs; both plaintiffs' allegations that Byus knew about their serious medical needs and acted with deliberate indifference; and both plaintiffs' allegations that the state defendants—Norris, Byus, and Mobley—violated their constitutional rights in designing or overseeing the Department of Correction's procedure for handling medical grievances.[4] The court denied the defendants' motions for summary

_____

[4]Curiously, the plaintiffs do not specifically identify the constitutional right at issue in this last set of allegations; on appeal, the plaintiffs merely call the grievance procedure "unconstitutional." Leaving a constitutional claim so nebulous is usually unpardonable. In this instance, however, it is obvious that the relevant allegations amount to claims of deliberate indifference, so we will treat them as such. We note in this regard that Hardin defined the claim with greater precision in one of his handwritten grievances, complaining in March 2005 that the grievance procedure "causes long delays in resolving . . . medical matter[s]" and that "the [designated] problem solvers cannot resolve such issues." Hardin went on to assert that the resulting "[d]elay of medical treatment . . . causes unnecessary suffering" and evinces "deliberate indifference to serious medical needs," in violation of "[his] 8th Amendment rights."

Also, we note that this set of allegations seems to focus exclusively on the version of the grievance procedure promulgated in February 2004. We are told that

-8-

judgment as to the claims premised on those allegations but granted the motions insofar as the plaintiffs' deliberate indifference claims were premised on different allegations (*e.g.*, Langford's allegation that CMS acted with deliberate indifference to his serious medical needs; Hardin's allegation that Dr. Ifediora acted with deliberate indifference to his serious medical needs; and so on).

Turning to the plaintiffs' other claims, the district court granted summary judgment to the state defendants on Langford's and Hardin's equal protection claims. But the court found that genuine issues of material fact precluded summary judgment on the plaintiffs' claims under the ADA and the Rehabilitation Act, as well as the state law negligence and outrage claims. On the last two claims, the district court rejected the state defendants' assertion of statutory immunity under section 19-10-305(a) of the Arkansas Code, which provides that state officials "are immune from liability and from suit, except to the extent that they may be covered by liability insurance, for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment." The district court found that whether the state defendants were covered by liability insurance was a disputed issue of fact that it could not resolve at the summary judgment stage.[5]

The state defendants moved to amend the district court's order, seeking permission "to take an immediate appeal . . . under 28 U.S.C. § 1292(b) on the issue

_____

the procedure was changed in May 2006, but the revised version of the grievance procedure was apparently omitted from the record. Hereafter, when we refer to "the grievance procedure," or use variations of that phrase, we are referring to the version promulgated in February 2004.

[5]Although the magistrate judge did not specifically address the plaintiffs' due process claims, the judge's recommendations included a catch-all dismissal of "remaining claims." The briefs on appeal do not contain any meaningful discussion of an alleged due process violation, so we need not consider the plaintiffs' due process claims.

of exhaustion."[6] The district court denied the motion, reiterating its view that "there is a genuine issue of material fact in dispute for a jury to decide" and noting that the state defendants had "failed to identify an issue of law that would warrant an interlocutory appeal."

Thereafter, the state defendants filed a notice of appeal, identifying two issues for review. The notice first declares that the state defendants appeal the district court's denial of qualified immunity on the plaintiffs' deliberate indifference claims. And, notwithstanding the district court's denial of certification under § 1292(b), the notice goes on to state that the defendants appeal the denial of summary judgment based on the plaintiffs' alleged failure to exhaust administrative remedies. The defendants baldly assert that "[t]his decision is . . . appealable pursuant to 28 U.S.C. § 1291" because it meets the "requirement[s] of the collateral order doctrine." The medical defendants filed a separate notice of appeal, which does not even attempt to identify a source of appellate jurisdiction to review the denial of summary judgment on the relevant claims against them.

The plaintiffs moved to dismiss the state defendants' appeal to the extent it challenges the denial of summary judgment based on their alleged failure to exhaust administrative remedies. The plaintiffs also moved to dismiss the state defendants' appeal to the extent it challenges the denial of summary judgment on the merits of their deliberate indifference claims (as opposed to the denial of qualified immunity). The plaintiffs filed a separate motion to dismiss the medical defendants' appeal in its entirety.

---

[6]Section 1292(b) authorizes a district court to certify that "an [interlocutory] order not otherwise appealable . . . involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." If a district court grants certification under § 1292(b), the court of appeals may then decide whether to exercise its discretion to permit an immediate appeal.

So much for our abbreviated introduction of the relevant facts. In the next section, we take up the issues raised on appeal, providing additional background as needed.

## II. DISCUSSION

### A.

The first matter we must address is the scope of our jurisdiction over these consolidated appeals. *See generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998) (discussing "[t]he requirement that jurisdiction be established as a threshold matter"). Under 28 U.S.C. § 1291, federal courts of appeals have "jurisdiction to hear appeals only from 'final decisions' of district courts." *Johnson v. Jones*, 515 U.S. 304, 309 (1995) (quoting § 1291). Generally speaking, "appeal must await the terminating order—the decision that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Davis v. Streekstra*, 227 F.3d 759, 762 (7th Cir. 2000) (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 521 (1988)). "[I]nterlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule." *Johnson*, 515 U.S. at 309.

Ordinarily, we lack jurisdiction "to hear an immediate appeal from a district court's order denying summary judgment, because such an order is not a final decision." *Krout v. Goemmer*, 583 F.3d 557, 563-64 (8th Cir. 2009) (citing § 1291, and *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005)). We do, however, have "limited authority . . . to review the denial of qualified immunity through an interlocutory appeal under the collateral order doctrine." *Id.* at 564 (citing *Johnson*, 515 U.S. at 311-12). Our jurisdiction to review the denial of qualified immunity "extends only to 'abstract issues of law,' not to 'determination[s] that the evidence is sufficient to permit a particular finding of fact after trial.'" *Id.* (alteration in original) (internal citation omitted) (quoting *Johnson*, 515 U.S. at 314, 317). "Thus, 'a

defendant entitled to invoke a qualified immunity defense may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial.'" *Id.* (quoting *Johnson*, 515 U.S. at 319-20). And we typically may not consider any other grounds for granting "summary judgment on the merits of the case at this interlocutory stage." *Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1012 (8th Cir. 2003) (en banc) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir. 1999)).

Here, we have jurisdiction over the state defendants' appeal insofar as it challenges the district court's denial of qualified immunity to Norris, Byus, and Mobley on the plaintiffs' deliberate indifference claims. More precisely, we have jurisdiction to consider the "purely legal" issue of whether the facts, taken in the light most favorable to the plaintiffs, support a finding that the state defendants violated Langford's and Hardin's clearly established constitutional rights. *See Kahle v. Leonard*, 477 F.3d 544, 549 (8th Cir. 2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985)).

The state defendants assert that we have jurisdiction to consider two other issues. The first of these is the district court's denial of statutory immunity to Norris, Byus, and Mobley on the plaintiffs' state law claims. Under Arkansas law, the denial of statutory immunity is immediately appealable, for as the Arkansas Supreme Court has explained, "the right of immunity from suit is effectively lost if a case is permitted to go to trial." *See, e.g.*, *City of Fayetteville v. Romine*, 284 S.W.3d 10, 13 (Ark. 2008) (citing *Ark. River Educ. Servs. v. Modacure*, 267 S.W.3d 595 (Ark. 2007)); *accord Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007) (explaining that "an order denying qualified immunity is immediately appealable even though it is interlocutory" because it would "otherwise . . . be 'effectively unreviewable'" (quoting *Mitchell*, 472 U.S. at 527)). The plaintiffs have not identified any grounds for carving out an exception to that rule in this case; indeed, the plaintiffs ignore the statutory immunity issue altogether. Although the district court premised its denial of statutory immunity

on the existence of a disputed factual issue, we find that the state defendants raise a purely legal question which can be resolved at this interlocutory stage. We will take up that question in our discussion of the merits at the end of this section; for present purposes, it suffices to say that we have jurisdiction to consider the denial of statutory immunity on the plaintiffs' state law claims.[7]

The state defendants also assert that we have jurisdiction to consider the district court's denial of summary judgment based on the plaintiffs' alleged failure to exhaust administrative remedies. As we mentioned above, the Prison Litigation Reform Act requires inmates to exhaust available administrative remedies before filing suit to challenge the conditions of their confinement. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The district court rejected the defendants' arguments based on § 1997e(a), finding that Hardin had exhausted available remedies and that there was a genuine issue of material fact about whether Langford had exhausted available remedies.

---

[7]We note that the state defendants refer to statutory immunity under section 19-10-305(a) as "qualified immunity," thereby adding unnecessary ambiguity to their presentation on appeal. This might explain why the state defendants' notice of appeal does not separately mention the denial of statutory immunity on the plaintiffs' state law claims. *Cf.* Fed. R. App. P. 3(c)(1)(B) (providing that the notice of appeal must "designate the judgment, order, or part thereof being appealed"). The plaintiffs do not suggest that they have been prejudiced by the imprecision in the state defendants' notice of appeal, and we are satisfied that the state defendants provided adequate notice of their intent to appeal the district court's decision on both the state and federal immunity defenses. *See Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051, 1058 (8th Cir. 2002) ("When determining whether an appeal from a particular district court action is properly taken, we construe the notice of appeal liberally and permit review where the intent of the appeal is obvious and the adverse party incurs no prejudice." (citing *Moore v. Robertson Fire Prot. Dist.*, 249 F.3d 786, 788 (8th Cir. 2001))).

Once more, we must start from the principle that appellate jurisdiction under 28 U.S.C. § 1291 extends only to "final decisions." A district court's denial of summary judgment "is a classic interlocutory order" because "[a]ll it does is require the litigation to continue." *Davis v. Streekstra*, 227 F.3d 759, 761 (7th Cir. 2000). "Such an order might be appropriate for certification under 28 U.S.C. § 1292(b)," *id.* (citing *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674 (7th Cir. 2000)), but here the district court refused to certify the exhaustion issue for immediate appeal. That setback did not deter the state defendants from including the exhaustion issue in their notice of appeal. The state defendants' new position is that the denial of summary judgment on grounds of failure to exhaust is immediately appealable under the collateral order doctrine.

"The collateral order doctrine is best understood not as an exception to the 'final decision' rule laid down by Congress in § 1291, but as a 'practical construction' of it." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). In *Cohen*, the U.S. Supreme Court identified a "small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'" *Swint v. Chambers County Comm'n*, 514 U.S. 35, 42 (1995) (citing *Cohen*, 337 U.S. at 546). *Cohen* defined this category as including "only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* (citing *Cohen*, 337 U.S. at 546). The state defendants insist that "the necessary factors . . . are present" in this case. State Defendants' Resp. to Mot. to Dismiss at 3. We disagree.

Even assuming that the district court's interlocutory order is "conclusive," and that the exhaustion issue is "important" and "separate from the merits," we reject the notion that the court's decision concerning the exhaustion requirement is "effectively unreviewable on appeal." *See Davis*, 227 F.3d at 762. As the Seventh Circuit held in *Davis*, "[a]rguments based on § 1997e(a) may be resolved on appeal from the final

-14-

judgment." *Id.* "If the plaintiff was required to exhaust yet failed to do so, the appellate court will hold that the suit must be dismissed without prejudice," *id.*, just as this court did in *Lyon v. Vande Krol*, 305 F.3d 806 (8th Cir. 2002) (en banc). *See also Davis*, 227 F.3d at 761 (collecting cases).

The state defendants seem to assume that the exhaustion requirement set out in § 1997e(a) is meant to confer some form of immunity from the costs of litigation. They are mistaken, since "[e]xhaustion requirements do not create absolute (or even qualified) rights to be free from litigation." *Id.* at 763. The state defendants also appeal to considerations of "judicial efficiency and economy," which they say "militate in favor of addressing the [exhaustion] issue" immediately. State Defendants' Reply Br. at 3. But such considerations obviously do not allow courts to disregard jurisdictional limits. On the contrary, the "possibility that a ruling may be erroneous and may impose additional litigation expense is not sufficient to set aside the finality requirement imposed by Congress." *Borntrager v. Cent. States, Se. & Sw. Areas Pension Fund*, 425 F.3d 1087, 1093 (8th Cir. 2005) (quoting *Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495, 499 (1989)). We see no other source of jurisdiction to review the district court's denial of summary judgment based on the plaintiffs' alleged failure to exhaust administrative remedies. Consequently, we dismiss the state defendants' appeal to the extent it challenges the district court's decision on the exhaustion issue.

That leaves the medical defendants' appeal from the denial of summary judgment on the relevant claims against them. The medical defendants cannot claim qualified immunity, and they do not dispute that the district court's partial denial of their motion for summary judgment is an interlocutory order. Instead, the medical defendants assert that we have pendent jurisdiction over their appeal because one of the issues it presents is "closely related" or "inextricably intertwined" with the issue presented in Byus's qualified immunity appeal. Medical Defendants' Br. at viii-ix. Here again, we disagree.

-15-

The medical defendants seem to believe that pendent appellate jurisdiction is far more capacious than it really is. To be sure, this court announced in *Drake v. Scott*, 812 F.2d 395 (8th Cir. 1987), that "'when an interlocutory appeal is before us . . . as to the defense of qualified immunity, we have jurisdiction also to decide closely related issues of law,' i.e., pendent appellate claims." *Kincade v. City of Blue Springs*, 64 F.3d 389, 394 (8th Cir. 1995) (quoting *Drake*, 812 F.2d at 399). But we clarified our view of pendent appellate jurisdiction after the Supreme Court decided *Swint*:

> In *Swint*, a unanimous Court ruled that although the Eleventh Circuit had jurisdiction to immediately review a district court's denial of a police officer's summary judgment motion on qualified immunity grounds, the court of appeals did not have jurisdiction to address an unrelated question of liability presented by the co-defendant County Commission. The Court emphasized that there was "no 'pendent party' appellate jurisdiction of the kind" that the court of appeals exercised in that case. Nevertheless, the Court stated that . . . "[w]e need not definitively or preemptively settle here whether or when it may be proper for a court of appeals with jurisdiction over one ruling to review, conjunctively, related rulings that are not themselves immediately appealable."

*Kincade*, 64 F.3d at 394 (alteration in original) (internal citations omitted) (quoting *Swint*, 514 U.S. at 50-51). In *Kincade*, we followed the Tenth Circuit in holding that, after *Swint*, "pendent appellate jurisdiction might still be appropriate where the otherwise nonappealable decision is 'inextricably intertwined' with the appealable decision, or where review of the nonappealable decision is 'necessary to ensure meaningful review' of the appealable one." *Id.* (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995)).

We can certainly review the denial of qualified immunity to the state defendants without also reviewing the denial of summary judgment to the medical defendants.

The question, then, is whether the medical defendants' appeal raises a pendent claim that is inextricably intertwined with Byus's qualified immunity appeal.

We have said that an otherwise nonappealable "issue is 'inextricably intertwined' with [a] properly presented issue[] only 'when the appellate resolution of the collateral appeal necessarily resolves the pendent claim[] as well.'" *Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1012 (8th Cir. 2003) (en banc) (quoting *Kincade*, 64 F.3d at 394). In other words, "[a] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal." *Kincade*, 64 F.3d at 394 (quoting *Moore*, 57 F.3d at 930). The medical defendants contend that "[t]he issue of actual injury [presented in their appeal] is dispositive as to the claims made against . . . Byus." Medical Defendants' Br. at viii. The pendent issue is purportedly "dispositive" in the sense that if we were to find that Langford and Hardin "did not meet proof with proof as to the issue of actual injury"—*i.e.*, whether the plaintiffs were actually injured by the medical defendants—the court "would not need to go forward with a qualified immunity analysis." Medical Defendants' Br. at viii-ix.

The medical defendants get the analysis backward; resolving the collateral claim (the denial of qualified immunity) must necessarily resolve the pendent claim (what the medical defendants call the "issue of actual injury"), not the other way around. The pendent claim that the medical defendants have identified is not coterminous with, or subsumed in, the qualified immunity claim, for holding that Byus is entitled to qualified immunity would not necessarily decide whether Langford and Hardin were actually injured by the medical defendants' alleged failure to provide efficacious treatment. Moreover, as we will discuss in greater detail below, we lack jurisdiction in these circumstances to review the "objective component" of a deliberate indifference claim, including "[w]hether there is verifying medical evidence that [a plaintiff] failed to receive the treatment he desired, and, if he did not, whether there

-17-

is verifying medical evidence that the failure to treat him was sufficiently serious." *Miller v. Schoenen*, 75 F.3d 1305, 1309 (8th Cir. 1996). Thus, the "issue of actual injury" is not inextricably intertwined with the issue presented in Byus's appeal from the denial of qualified immunity. And there is no evident basis for finding that any other issue presented in the medical defendants' appeal qualifies as inextricably intertwined with the relevant collateral claim. Consequently, we dismiss the medical defendants' appeal in its entirety.

### B.

Having decided the scope of our jurisdiction, we may now address the merits of the state defendants' challenges to the denial of qualified immunity on the plaintiffs' deliberate indifference claims. Recall that two categories of deliberate indifference claims against the state defendants survived summary judgment: first, the claims premised on allegations that Byus knew about the plaintiffs' serious medical needs and acted with deliberate indifference; and second, the claims premised on allegations that Norris, Byus, and Mobley acted with deliberate indifference in designing or overseeing the Department of Correction's procedure for handling medical grievances. The state defendants seek qualified immunity on these claims as a shield against civil damages. *See Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) (noting that qualified immunity shields government officials from liability for civil damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated").

"We review a district court's qualified immunity determination on summary judgment *de novo*, viewing the record in the light most favorable to [the plaintiffs] and drawing all reasonable inferences in [their] favor." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (citing *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 987 (8th Cir. 2009)). For each category of claims, the inquiry comes down to two questions: "(1) whether the facts alleged or shown, construed in the light most favorable to [the

plaintiffs], establish a violation of a constitutional . . . right, and (2) whether that constitutional right was clearly established as of [the time of the relevant conduct], such that a reasonable official would have known that his actions were unlawful." *Id.* (citing *Pearson v. Callahan*, 555 U.S. ---, 129 S. Ct. 808, 815-16 (2009), and *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 129 S. Ct. at 818). "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Id.* Typically, when we are "faced with an argument that the district court mistakenly identified clearly established law, . . . [we] can simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Johnson v. Jones*, 515 U.S. 304, 319 (1995). Unfortunately, the district court in this case failed to state all of the relevant facts, so we have "undertake[n] a cumbersome review of the record to determine what facts the district court, in the light most favorable to the . . . [plaintiffs], likely assumed." *Id.*; *see also Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). We begin our analysis with the plaintiffs' deliberate indifference claims against Byus and then turn to the plaintiffs' claims against Norris, Byus, and Mobley regarding the grievance procedure.

It is well established that "[d]eliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *See Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "To show deliberate indifference, plaintiffs must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." *Id.* (citing *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005)). Prisoners may prove deliberate indifference by showing that the total deprivation of medical care resulted in "pain and suffering" or "a lingering death." *Estelle*, 429 U.S. at 103. But a total deprivation of care is not a necessary condition for finding a constitutional violation: "Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." *Smith v. Jenkins*, 919 F.2d

90, 93 (8th Cir. 1990) (citations omitted). To state a claim based on "inadequate medical treatment . . . [t]he plaintiff 'must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Alberson v. Norris*, 458 F.3d 762, 765 (8th Cir. 2006) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

Byus is the Administrator for Medical Services for the Department of Correction, but he is not a medical doctor and does not personally treat inmates' medical needs. As the plaintiffs concede, prison supervisors such as Byus cannot be held liable under § 1983 on a theory of respondeat superior. *See, e.g.*, *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). Supervisors can, however, "incur liability . . . for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices." *Id.* (internal quotation marks and citation omitted) (quoting *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990), and *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)). "Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) (citing *Estelle*, 429 U.S. at 103). It follows that "where the duty to furnish treatment is unfulfilled, the mere contracting of services with an independent contractor does not immunize the State from liability for damages in failing to provide a prisoner with the opportunity for such treatment." *Id.* (citing *West v. Atkins*, 487 U.S. 42, 55 (1998)); *see also Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995).

As to the first category of claims, we are convinced that the facts, construed in the light most favorable to Langford and Hardin, establish a violation of their rights under the Eighth Amendment. Specifically, Langford alleges that he has suffered for years from stomach and back pain, among other ailments, and that these infirmities have not been adequately treated. We assume for purposes of this appeal that Langford's medical needs are objectively serious, *see Krout*, 583 F.3d at 568—a not

implausible assumption since Langford was twice rushed to a hospital for emergency care. *See also Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir. 1997) (finding that "substantial back pain" was a serious medical need); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 829 (7th Cir. 2009) (collecting cases holding that "delays in treating painful medical conditions, even if not life-threatening, may support an Eighth Amendment claim"). There is no doubt that Byus has a constitutional duty to see that prisoners in his charge who need medical care receive it. So if Byus knew that Langford's serious medical needs were not being adequately treated yet remained indifferent, he may be held personally liable. *See Crooks*, 872 F.2d at 804.

Hardin's claim against Byus is even stronger than Langford's. Recall that Hardin alleges that a lapse in treatment following surgery for his broken ankle led to, or perhaps merely exacerbated the effects of, a condition called "Charcot foot." We assume for purposes of this appeal that Hardin's medical needs were objectively serious, *see Krout*, 583 F.3d at 568—which should be uncontroversial given the pernicious effects of Charcot foot, including severe pain and irreversible deformity. Again, there is no doubt that Byus has a constitutional duty to see that prisoners in his charge who need medical care receive it. So if Byus knew that Hardin's serious medical needs were not being adequately treated yet remained indifferent, he may be held personally liable. *See Crooks*, 872 F.2d at 804. We therefore conclude that each plaintiff has a sound theory of the constitutional violation. *See Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003).

It remains to decide whether the right Byus allegedly violated was clearly established. This part of the inquiry demands that reviewing courts "do more than determine that the law was 'clearly established' in the abstract." *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995); *see also Kahle v. Leonard*, 477 F.3d 544, 553 (8th Cir. 2007) ("At a high enough level of abstraction, every constitutional right is clearly established."). We must instead "examine the information possessed by the

government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law." *Miller v. Schoenen*, 75 F.3d 1305, 1308 (8th Cir. 1996) (citing *Anderson*, 483 U.S. at 640, and *Reece*, 60 F.3d at 489). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citation omitted).

In this case, it is plain that if Byus knew all the relevant facts about Langford's and Hardin's medical needs, the unlawfulness of failing to ensure that they received adequate treatment would have been apparent. The more difficult question centers on how much Byus actually knew about Langford's and Hardin's medical needs and the allegedly inadequate treatment they received. As we have said, we may take as given the facts that the district court assumed. *See Johnson*, 515 U.S. at 319. But the only relevant fact identified in the magistrate judge's proposed findings and recommendations is that Byus sent letters to Langford and Hardin in which he acknowledged receiving letters from them. We are left, then, with the task of reconstructing "what facts the district court, in the light most favorable to the . . . [plaintiffs], likely assumed." *See id.*; *see also Behrens*, 516 U.S. at 313.

The district court likely inferred that the letters from Langford and Hardin contained at least some description of their medical needs—Langford's stomach and back pain and Hardin's Charcot foot—and the perceived inadequacy of the treatment they had received to that point. Byus's reply letters support that inference: Byus's letter to Langford says that Langford wrote him concerning "competent medical staff," and Byus's letter to Hardin says that Hardin wrote him concerning "injury to right ankle and request to see Orthopedic Specialist." Moreover, under the so-called "adverse inference rule," Byus's failure to produce the letters he received from Langford and Hardin permitted the district court to infer that the evidence contained

in those letters would undermine his defense. *See* 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 285, at 192 (James H. Chadbourn rev. 1979); 2 Kenneth S. Broun, et al., *McCormick on Evidence* § 264, at 220-21 (6th ed. 2006); *see also Int'l Union, UAW v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972) ("Simply stated," the adverse inference rule "provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.").[8] And the district court could certainly assume, based on the e-mails that Byus received on July 26 and July 27, 2005, that Byus had actual knowledge of at least some of Langford's medical problems and how those problems had been dealt with.

Considering these facts together, and drawing all reasonable inferences from them in favor of the plaintiffs, we are convinced that the constitutional right at issue was clearly established as of the time of the relevant conduct, such that a reasonable supervisory official would have known that his actions were unlawful. That is to say, a reasonable official standing in Byus's shoes would have understood that ignoring Langford's and Hardin's complaints about receiving deficient medical care contravened clearly established principles of Eighth Amendment jurisprudence. *See Miller*, 75 F.3d at 1308; *Boyd*, 47 F.3d at 968; *Crooks*, 872 F.2d at 804.

---

[8]We note that Byus has not attempted to show that Langford's and Hardin's letters were destroyed or misplaced. *Cf. Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 761 n.3 (8th Cir. 2005) (noting that the adverse inference rule "applies only 'when a party has relevant evidence *within its control* which it fails to produce'" (quoting *Rockingham Machine-Lunex Co. v. NLRB*, 665 F.2d 303, 304 (8th Cir. 1981))). Nor has Byus offered any other explanation for failing to produce the letters. *Cf.* 2 Wigmore, *supra*, § 285, at 192 (stating that an adverse inference against a party who fails to produce evidence in his control is "open always to explanation by circumstances which make some other hypothesis a more natural one than the party's fear of exposure").

Byus's contrary arguments are uniformly without merit.  For instance, Byus emphasizes that he "is not a physician" and "is not engaged in day to day medical care."  State Defendants' Br. at 24.  But those facts do not make him immune from liability for his personal involvement in an alleged constitutional violation.  *See Choate*, 7 F.3d at 1376.  Byus also suggests that the letters he wrote to Langford and Hardin prove that he was not deliberately indifferent to their serious medical needs.  In particular, Byus recounts that he "advised Langford to use the grievance procedure" and that he told both Langford and Hardin that their complaints "would be referred to the Health Services Administrator."  State Defendants' Br. at 29.  But Byus has failed to identify any evidence (apart from the letters themselves) showing that the promised referrals were actually made, much less that a proper investigation was eventually conducted.  And, in any event, Byus did not insulate himself from liability merely by passing Langford's and Hardin's complaints on to someone else in the prison bureaucracy, or by deferring to his role (if any) in the official grievance procedure.  *See generally McKenna v. Wright*, 386 F.3d 432, 438 (2d Cir. 2004) ("When allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility." (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995))).

Byus makes two additional arguments that raise nonappealable issues.  Byus first argues that "Langford has not presented any *verifying medical evidence*, as required by law, to establish the detrimental effect of any alleged delay in medical treatment."  State Defendants' Br. at 27 (citing *Beyerbach v. Sears*, 49 F.3d 1324 (8th Cir. 1995)).  Byus relies on our decision in *Beyerbach*, which held that a similar argument based on a prisoner's failure to produce "verifying medical evidence" was "within our appellate jurisdiction on appeal from denial of a motion for summary judgment based on qualified immunity," *Reece*, 60 F.3d at 491-92.  Byus's reliance on *Beyerbach* is misplaced, because our later precedents make clear that "the Supreme

-24-

Court's opinion in *Johnson v. Jones* overturned [the] portion of *Beyerbach* that held that we have jurisdiction to hear such an argument," *Miller*, 75 F.3d at 1309 (citing *Reece*, 60 F.3d at 492). After *Johnson*, "[w]hether there is verifying medical evidence that [a plaintiff] failed to receive the treatment he desired, and, if he did not, whether there is verifying medical evidence that the failure to treat him was sufficiently serious, are questions beyond our jurisdiction in this [species of] interlocutory appeal." *Id.*

The second problematic argument starts and ends with the assertion that "[t]here is . . . no proof that *any* action by Byus *caused* injuries to Langford." State Defendants' Br. at 27 (second emphasis added). Like his argument about verifying medical evidence, Byus's argument about causation is contrary to *Miller*, which made clear that "we have no jurisdiction . . . in an interlocutory appeal of a denial of a summary-judgment motion based on qualified immunity" to review "issues relat[ing] to whether . . . [a government official] actually committed the act of which he is accused, or damages, *or causation*, or other similar matters that the plaintiff must prove," 75 F.3d at 1309 (emphasis added). For the reasons discussed above, we affirm the district court's order insofar as it denied qualified immunity to Byus on the plaintiffs' first category of deliberate indifference claims.

The second category of claims relates to the grievance procedure for medical issues, which, according to the plaintiffs, is both too complicated and too protracted.[9]

---

[9]By way of background, the grievance procedure has three stages. First, within fifteen days of a "grievable" incident, an inmate must fill out an "informal resolution form" and submit the form to a designated "problem solver." The problem solver then has three working days to attempt to solve the problem informally. If the problem cannot be solved informally, the inmate may proceed to the formal grievance stage. Within three working days of the failed informal resolution attempt, the inmate must fill out a "formal grievance form," and place that form (along with the informal resolution form) in a designated "grievance box." Once the formal grievance is processed by the designated "grievance officer," the warden, or in the case of medical

The state defendants apparently do not dispute the plaintiffs' assertion that they each played a direct role in designing or overseeing the grievance procedure. The plaintiffs allege that funneling medical grievances through that unwieldy procedure impeded their ability to obtain efficacious treatment and thereby caused or exacerbated their alleged injuries. Because Norris, Byus, and Mobley designed or oversaw the grievance procedure, the argument runs, they may be held liable if it resulted in the denial of constitutionally adequate treatment. This is a plausible theory of the constitutional violation, and it fits comfortably under the rubric of deliberate indifference. *See, e.g.*, *Crooks*, 872 F.2d at 804 (holding that prison supervisors may be held liable for "inadequate prison policies or medical supervision . . . just as if they had refused to deliver [medical] services themselves"); *Messimer v. Lockhart*, 702 F.2d 729, 732 (8th Cir. 1983) (holding that the Director of the Arkansas Department of Correction could be held liable for failing to override "policy decisions" that allegedly led to unconstitutional conditions of confinement); *see also Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (holding that deliberate indifference "can be demonstrated by 'proving there are such systemic and gross deficiencies in . . . procedures that the inmate population is effectively denied access to adequate medical care'" (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980))). Thus, we are convinced with respect to these claims as well that the facts,

---

grievances, the "Health Services Administrator," has twenty working days to issue a written decision. If the inmate is not satisfied with the outcome at the formal grievance stage, he may proceed to the appeal stage. Within five working days, the inmate must fill out the appeal section of the "warden/supervisor's decision" form, and submit that form (along with the formal grievance form and other pertinent forms) to the appropriate deputy director or assistant director. The director responsible for adjudicating the appeal then has thirty working days to issue a written decision. Ordinarily, the entire process must be completed within seventy-six working days. At the last two stages, however, if the warden, administrator, or director files a "grievance extension form," the relevant time limits are extended automatically, unless the inmate disagrees in writing. In the event the inmate refuses to acquiesce to an extension, the inmate is deemed to have waived his right to an administrative decision on the merits of the grievance.

construed in the light most favorable to the plaintiffs, establish a violation of the plaintiffs' rights under the Eighth Amendment.

It seems reasonably certain that the relevant legal principles were clearly established in an abstract sense. Whether the unlawfulness of the state defendants' conduct would have been apparent to reasonable supervisory officials standing in Norris's, Byus's, and Mobley's shoes is a much thornier question. We need not enter that thicket, however, since the question is effectively mooted by the state defendants' failure to offer any remotely plausible argument for deciding the issue in their favor. The state defendants' lone contention on this point is that Langford's and Hardin's clearly established rights have not been violated because "[t]he record reflects that [they] have utilized the grievance procedure on numerous occasions." State Defendants' Br. at 31. This is a flimsy defense. While proving that the grievance procedure was accessible might be a necessary condition for avoiding liability on the relevant claims, accessibility obviously is not a sufficient condition. Suppose the plaintiffs were allowed to file as many grievances as they wished but every grievance was automatically denied without review after seventy-six working days. This procedure would impose no limits on the plaintiffs' ability to file grievances, but no one would say for that reason alone that their rights under the Eighth Amendment had been preserved.

In light of the state defendants' failure to identify a sound basis for overturning the district court's denial of qualified immunity on the second category of claims, we accept for purposes of this appeal the plaintiffs' virtually uncontested argument that the constitutional right at issue was clearly established as of the time of the relevant conduct, such that reasonable supervisory officials would have recognized that their actions were unlawful. *Cf. Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1265 n.3 (10th Cir. 2008) ("It is not our role to play the part of counsel by making an argument for a [well-represented] party . . . that it has not chosen to make for itself." (citing *Am. Airlines v. Christensen*, 967 F.2d 410, 415 n.8 (10th Cir. 1992))). That is to say, we

are satisfied that reasonable officials who knew that the grievance procedure hindered rather than helped inmates with serious medical needs—as the plaintiffs have alleged—would have understood that failing to take corrective action contravened clearly established principles of Eighth Amendment jurisprudence. *See Miller*, 75 F.3d at 1308; *Crooks*, 872 F.2d at 804; *Messimer*, 702 F.2d at 732. For the reasons discussed above, we affirm the district court's order insofar as it denied qualified immunity to the state defendants on the plaintiffs' second category of deliberate indifference claims.

C.

That brings us at last to the district court's denial of statutory immunity on the plaintiffs' state law claims. The plaintiffs ignore this issue, and the state defendants treat it as an afterthought, so we will keep our analysis short.

Section 19-10-305(a) of the Arkansas Code provides that "[o]fficers and employees of the State of Arkansas are immune from liability and from suit, except to the extent that they may be covered by liability insurance, for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment." The district court found that whether the state defendants were covered by liability insurance was a disputed issue of fact that it could not resolve at the summary judgment stage. On appeal, the state defendants contest that conclusion, asserting that they are entitled to immunity under section 19-10-305(a) because the record contains an "unrefuted" declaration by the Department of Correction's chief fiscal officer showing that they are not covered by liability insurance. State Defendants' Br. at 33. In lieu of considering that fact-based challenge to the district court's decision, we turn instead to the state defendants' alternative argument: that they are entitled to immunity under section 19-10-305(a) because the plaintiffs' amended complaint fails to allege that Norris, Byus, or Mobley

"acted with malice or beyond the scope of [his] employment," State Defendants' Br. at 32.

The Arkansas Supreme Court has held that "a bare allegation of willful and wanton conduct will not suffice to prove malice." *Ark. Dep't of Envtl. Quality v. Al-Madhoun*, 285 S.W.3d 654, 660 (Ark. 2008) (citing *Simons v. Marshall*, 255 S.W.3d 838 (Ark. 2007)). As to the plaintiffs' state law claims, we have not discovered even bare allegations of willful, wanton, or otherwise malicious conduct on the part of Norris, Byus, or Mobley, much less sufficient "factual support" to stave off summary judgment. *See id.* Accordingly, we reverse the district court's order insofar as it denied statutory immunity to Norris, Byus, and Mobley on the plaintiffs' state law claims and remand with instructions to grant this part of the state defendants' motion for summary judgment.

## III. CONCLUSION

For the foregoing reasons, we dismiss in part for lack of jurisdiction, affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

_____