# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3055

_____

United States of America

*Plaintiff - Appellee*

v.

Mariano Valencia Mendoza

*Defendant - Appellant*

_____

No. 11-3062

_____

United States of America

*Plaintiff - Appellee*

v.

Jose Francisco Garza Tovar

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: March 15, 2012
Filed: September 10, 2012

Before WOLLMAN and COLLOTON, Circuit Judges, and HICKEY,[1] District Judge.

_____

COLLOTON, Circuit Judge.

Mariano Valencia Mendoza and Jose Francisco Garza Tovar entered conditional guilty pleas to possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). On appeal, they challenge the district court's[2] denial of their motions to suppress evidence. We affirm.

I.

On December 21, 2010, Officer Stephanie Swartz of the Des Moines Police Department was on routine patrol when she overheard a radio request from agents of the Drug Enforcement Administration. The agents wanted a marked unit of the police department to stop a black Volvo sedan that was under surveillance. Swartz saw the vehicle, pulled behind it, and made a traffic stop. In explaining the basis for the stop, Swartz testified:

> There was what appeared to be a paper tag up in the left-hand corner of the rear window, I was pretty confident that it wasn't an Iowa tag, I couldn't read the state of origin, and I had had two recent cases that I

_____

[1] The Honorable Susan O. Hickey, United States District Judge for the Western District of Arkansas, sitting by designation.

[2] The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

-2-

had dealt with within the past six months where people had either forged tags for themselves or bought fraudulent tags from other people to be displayed in the vehicle.

Swartz was approximately fifteen to twenty feet behind the vehicle when she observed the tag and decided to stop the car. She was unfamiliar with temporary tags from States other than Iowa and Illinois, and she was unable to read the name of a State of origin on the tag. Swartz thought the tag looked improper and looked like something a person could make with a printer. She also noticed that the tag's expiration date was written in large, handwritten block numbers. She thought this was suspicious, because block numbering could be used to alter an expiration date.

Swartz approached the car and asked the driver, Tovar, for his driver's license. Tovar said he did not have a license, and Swartz asked Tovar and his passenger, Mendoza, to step out of the vehicle. Swartz asked Tovar if there was anything in the car that she "needed to be concerned about," to which Tovar replied, "no, go ahead and look." While Swartz issued Tovar a citation for driving without a license, another officer searched the vehicle and found controlled substances.

A grand jury charged Tovar and Mendoza with possession with intent to distribute 500 grams or more of methamphetamine. Both defendants moved to suppress the evidence obtained from the search of the vehicle. Noting that the vehicle displayed a valid temporary tag from another State, they argued that Swartz's decision to stop the car was not supported by reasonable suspicion or probable cause. Because the stop was unlawful, they argued, Tovar's consent to search the vehicle and his subsequent statements to law enforcement were the fruits of an illegal seizure.

The district court, relying on our decision in *United States v. Sanchez*, 572 F.3d 475 (8th Cir. 2009), denied the motions to suppress. The court found that Swartz "credibly testified that she could not read the state of origin of the temporary tag and

that she genuinely believed based on her experience that the tag's simple color scheme made it appear like something that could be forged." The court deemed *Sanchez* indistinguishable and concluded that Swartz had reasonable suspicion to make the traffic stop.

Tovar and Mendoza entered conditional guilty pleas, reserving the right to appeal the denial of their motions to suppress. On appeal, Tovar argues that the district court made clearly erroneous factual findings regarding Swartz's credibility, and both defendants argue that Swartz's seizure of the car violated the Fourth Amendment.

## II.

The Fourth Amendment prohibits "unreasonable searches and seizures." A traffic stop constitutes a seizure of the vehicle's occupants. *Brendlin v. California*, 551 U.S. 249, 255-57 (2007). To be reasonable, the stop must be supported by at least "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted). We review the district court's factual findings for clear error and its legal conclusions *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

## A.

We see no clear error in the district court's factual findings. Tovar argues that Swartz's testimony was inconsistent with her report, in which Swartz stated that she "could not read" the paper in the vehicle's rear window. Tovar maintains that Swartz "modified her story" when she testified that she "couldn't really read any part of the tag well." He also argues that Swartz's testimony regarding the tag's coloring and block numbers is inconsistent with her report, which did not mention these facts. Swartz's testimony is not internally inconsistent or facially implausible. While

documents or objective evidence may contradict a witness's story and render her testimony incredible, *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985), there is no such contradiction here. Swartz's testimony provided additional details regarding her observations, but elaboration is not a contradiction that compels a finding that the witness was incredible.

Tovar also argues that the court clearly erred in finding that Swartz believed that the tag's "simple color scheme" made it look like something that could be forged. This finding, however, was a reasonable inference from Swartz's testimony. Swartz testified that Iowa's temporary tags include a "red kind of swirly symbol," and that the tag in this case did not feature the colors of an Iowa temporary tag. She testified that she saw "blue bars of some kind" on the tag, but she did not recognize the colors, and she observ ed that she "couldn't verify that it was a legitimate tag and not something that someone had made on their printer." In light of this testimony, we cannot say that the district court's finding is clearly erroneous.

Tovar next contends that Swartz was "less than forthcoming" about her experience with forged tags. He points to cross-examination in which Swartz acknowledged telling an investigator that she "often" encountered fraudulent temporary tags during traffic stops, even though the government produced reports of only two such incidents at the hearing. Swartz also testified, however, that she has stopped a number of cars with altered tags, but that not all of those incidents resulted in citations or arrests. The district court thus reasonably inferred that Swartz had recent experience with fraudulent tags, and that she "genuinely believed based on her experience" that the tag could have been forged. There is no clear error on this point.

Finally, Tovar argues that Swartz's testimony that she did not look at the tag while approaching the vehicle is "so implausible on its face" that the district court clearly erred in crediting any of Swartz's testimony. Swartz explained that she did not look at the tag because her "attention [was] on the driver and any other occupants

of the vehicle for safety reasons." She elaborated that she was "[t]rying to make sure that nobody has a weapon, nobody is fleeing the vehicle, nobody is making any furtive movements in the front seat or the back seat, ascertain how many passengers there are, et cetera." Especially in view of the fact that Swartz knew the occupants were under investigation by the Drug Enforcement Administration, this testimony is not inherently implausible.

B.

The district court determined that this case is controlled by our decision in *Sanchez*. In that case, a Nebraska state trooper observed a minivan without a front or rear license plate, but with a piece of paper affixed where a rear license plate would have been displayed. *Sanchez*, 572 F.3d at 476. As the trooper pursued the minivan and approached it from the rear, he could read three lines of text on the paper. *Id.* at 476-77. At the bottom of the paper, in much smaller type, were the words "Arizona Temporary Registration Plate." *Id.* The law enforcement officer, however, could not read these words from his vantage point, and he could not discern the name of any issuing State. *Id.* at 477. "Suspecting that the paper was not an official document, he decided to stop the minivan to investigate." *Id.* The trooper eventually obtained consent to search the minivan and found controlled substances. *Id.* The defendants moved to suppress the evidence obtained from the search. *Id.* They argued that the piece of paper was a valid Arizona temporary plate, and because it was clearly visible from the outside of the vehicle, the officer should have recognized that it was an official document. *Id.* The district court denied the motions to suppress, and the defendant was convicted.

On appeal, we noted that Nebraska law generally requires vehicles to display front and rear license plates, but makes an exception for recently purchased vehicles, which may display two temporary "In Transit" stickers. *Id.* at 478. Nebraska law also provides an exception for out-of-state vehicles, which must comply with the

requirements of the jurisdiction in which they are registered. *Id.* Even assuming that the vehicle in *Sanchez* properly displayed registration from another jurisdiction, we held that the traffic stop was lawful. *Id.* We thought it was "objectively reasonable for [the trooper] to expect that the name of the issuing jurisdiction would appear conspicuously on the face of an official document, and to investigate further if a name was not visible." *Id.* at 479. "[B]ecause the printing on the paper affixed to the rear was too small to read in its entirety, and no issuing jurisdiction was identifiable, he reasonably suspected that the paper was not an official document that complied with the licensing requirements of another State." *Id.*

Iowa law generally requires vehicles to display front and rear license plates. Iowa Code § 321.37(1). Owners of recently purchased vehicles, however, may display a "registration applied for" card on the rear of the vehicle for forty-five days. *Id.* § 321.25. Iowa also makes exception for nonresidents' vehicles, which need only display the registration required by the nonresident's jurisdiction. *Id.* § 321.53.

The determination of whether reasonable suspicion existed "is not to be made with the vision of hindsight, but instead by looking at what the officer reasonably knew at the time." *Sanchez*, 572 F.3d at 478 (internal quotation omitted). At the time of the traffic stop, Swartz observed what appeared to be a paper tag in the vehicle's rear window. She was confident that it was not an Iowa temporary tag. Despite observing it from a distance of fifteen to twenty feet, she was unable to identify an issuing State. Her suspicions also were aroused by the large, handwritten block numbers. In her experience, dealers write expiration dates with a single stroke, and block numbers could be used to alter a date written in this manner. Given the tag's overall appearance, Swartz thought it looked like something a person could have created on a printer. Considered in light of Swartz's experience with falsified or fraudulent tags, these observations provided her with a particularized and objective basis to suspect that the tag was not a valid registration document. We therefore

-7-

conclude that Swartz had reasonable suspicion to believe that the vehicle did not display valid proof of vehicle registration, as required by Iowa law.

Mendoza and Tovar argue that this case is distinguishable from *Sanchez* because, unlike Swartz, the trooper in *Sanchez* attempted to read the tag as he approached the vehicle on foot, but he still did not see the name of any issuing State. *See* 572 F.3d at 477. We disagree. The issue in *Sanchez* was whether the trooper's "decision *to stop* the minivan" was lawful. *Id.* at 478 (emphasis added). Although we noted the trooper's post-stop effort to inspect the tag in *Sanchez*, Swartz's failure to do so has no bearing on whether she had reasonable suspicion to make the traffic stop in the first place. Mendoza and Tovar do not argue that Swartz unreasonably prolonged or exceeded the scope of the stop by failing immediately to inspect the tag. *Cf. United States v. Hollins*, 685 F.3d 703, 706-07 (8th Cir. 2012).

Mendoza and Tovar also emphasize our observation in *Sanchez* that it was "objectively reasonable for [the officer] to expect that the name of the issuing jurisdiction would appear conspicuously on the face of an official document, and to investigate further if a name was not visible." 572 F.3d at 479. They argue that Swartz could not reasonably have the same expectation in this case, because even Iowa's temporary tags do not "conspicuously" display the name of the issuing State. In essence, the appellants suggest that if it is generally impossible for officers to verify the validity of temporary tags without stopping a vehicle, then the presence of that ordinary fact cannot amount to reasonable suspicion. The record here, however, includes more than an assertion by Swartz that she could not verify the validity of a tag that appeared on its face to be legitimate. She gave particularized reasons why she suspected that this particular tag may have been fraudulently created on a printer rather than issued by an official authority. The showing of reasonable suspicion in this case does not depend on the sort of expectation mentioned in *Sanchez*.

Mendoza suggests that the officer in *Sanchez* had greater grounds for suspicion because he saw only a "piece of paper" attached to the vehicle, while Swartz, according to Mendoza, "knew the document taped to the rear window was a temporary registration tag." As the district court found, however, Swartz saw only "what appeared to be a paper tag" posted in the rear window. When asked whether she could see that the vehicle had "some type of temporary tag," Swartz stated only that she "could see that it had a piece of paper." The record does not establish that Swartz knew the document was a legitimate temporary registration tag.

This case is therefore distinguishable from *United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000) (en banc), where an officer attempted to justify his stop of a vehicle based simply on his inability to read the expiration date on a temporary tag due to darkness and small print. In *Wilson*, the officer "admitted that he never saw anything illegal about the tag or the operation of the car," testified that "nothing appeared illegal about the temporary tag," and acknowledged that he had "no suspicion at all" that the driver was operating an unregistered vehicle or otherwise violating the law. *Id.* at 723. "Simply put, he saw nothing wrong, and he suspected nothing," so there was no reasonable suspicion. *Id*. at 724. The more analogous authority is *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006), where an officer lawfully stopped a vehicle not merely because he could not read a temporary tag, but because "he could not determine whether the document posted in the rear window was, in fact, a temporary tag." *Id.* at 1047.

\* \* \*

Because the traffic stop did not violate the Fourth Amendment, the evidence obtained from the search of the vehicle and Tovar's subsequent statements to law enforcement were not the fruits of a constitutional violation. The judgments of the district court are affirmed.

_____