# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1683

_____

United States of America

*Plaintiff - Appellant*

v.

Daytoviane Dapree McLemore

*Defendant - Appellee*

_____

No. 17-1684

_____

United States of America

*Plaintiff - Appellant*

v.

Joshua Adam Rode

*Defendant - Appellee*

_____

Appeals from United States District Court
for the Northern District of Iowa - Waterloo

_____

Submitted: December 15, 2017
Filed: April 13, 2018
_____

_____

Before WOLLMAN, LOKEN, and MURPHY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Indicted for possession of a firearm by an unlawful drug user in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2), Joshua Rode and Daytoviane McLemore moved to suppress the firearm discovered during a traffic stop. The district court,[1] sustaining their objections to the magistrate judge's contrary Report and Recommendation, ruled that the traffic stop violated the Fourth Amendment because the officers lacked reasonable suspicion or probable cause that the vehicle was being operated without a valid temporary registration card. See Iowa Code §§ 321.25, 321.98. The government appeals the grant of the motions to suppress. Concluding the district court correctly distinguished our prior decisions that upheld traffic stops for possible vehicle registration violations, we affirm.

At 9:45 p.m. on July 1, 2016, Waterloo, Iowa police officers Kye Richter and Jamie Sullivan, patrolling a high crime neighborhood, observed McLemore standing next to a BMW parked at 820 Logan Avenue, a residence frequented by members of one of two rival gangs. Two days earlier, while investigating reports of a nearby shooting, Sergeant Richter and Officer Diana Del Valle had seen Rode exit the BMW after it stopped near Logan Avenue. Del Valle had learned that Rode was affiliated with the gang that frequented 820 Logan and may have been the victim of an

_____

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

unreported shooting a few days earlier. Richter and Sullivan decided to stop the BMW to investigate these suspicious circumstances.

Richter radioed Officer Del Valle, patrolling in a different car, and told her to go to the Logan Avenue area and wait for the BMW to leave. When the BMW departed ten minutes later, Del Valle followed. She saw that the BMW had a dealer advertising plate instead of a rear license plate, which she had noticed two days earlier, and a temporary paper card taped to the inside of the left rear window. Del Valle radioed Richter and Sullivan she had seen "no violations yet." They asked about the card in the back window. Del Valle said, "you can see a plate, but you can't read what's on it." Officer Sullivan replied, "there you go." Del Valle activated the lights on her police cruiser and made an "equipment stop." She testified that she could first read the numbers on the temporary card when "I got to the trunk area." She did not examine whether the temporary card was valid (it was) because "I already had the probable cause, which was a temporary tag. I wasn't focused on whether that tag was valid or not at that time." During the stop, Del Valle smelled marijuana, and Sergeant Richter discovered a firearm during his pat-down search of McLemore.

Both defendants moved to suppress the firearm, raising multiple Fourth Amendment issues. After a combined hearing at which Del Valle and Richter testified, the magistrate judge issued a Report and Recommendation recommending both motions be denied, concluding that the temporary tag issue was controlled by our prior decision in United States v. Givens, 763 F.3d 987, 991 (8th Cir. 2014), cert. denied, 135 S. Ct. 1520 (2015), because "Del Valle was unable to read the paper plate until after she stopped and approached the vehicle." Defendants filed objections; the district court granted their motions to suppress. The court distinguished Givens because "Del Valle did not state that she suspected Rode or McLemore were violating Iowa Code § 321.25 by not having proper registration," whereas the officer in Givens

-3-

"stated that he typically could read temporary tags at night, that he could not read Givens' tag, and that there had been a rash of fraudulent tags."

On appeal, the government argues that Officer Del Valle had reasonable suspicion to stop the BMW for an equipment violation because she was unable to read what appeared to be a temporary registration card taped to its rear window. Though the parties argue other issues, the appeal turns on this question of law that we review *de novo*. United States v. Ellis, 501 F.3d 958, 961 (8th Cir. 2007).

Absent a valid basis for seizure, a traffic stop requires "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered." Delaware v. Prouse, 440 U.S. 648, 663 (1979); see United States v. Hollins, 685 F.3d 703, 705-06 (8th Cir. 2012). However, if an officer has reasonable suspicion or probable cause to stop for a traffic violation, "any ulterior motivation on the officer's part is irrelevant." United States v. Fuehrer, 844 F.3d 767, 772 (8th Cir. 2016) (quotation omitted), cert. denied, 137 S. Ct. 2107 (2017); see Whren v. United States, 517 U.S. 806, 813 (1996). Reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of breaking the law." Heien v. North Carolina, 135 S. Ct. 530, 536 (2014) (quotation omitted).

A number of prior cases have considered the Fourth Amendment validity of traffic stops to investigate whether a vehicle was being operated in violation of state registration laws. For example, in United States v. Geelan, 509 F.2d 737, 743-44 (8th Cir. 1974), cert. denied, 421 U.S. 999 (1975), and in United States v. Smart, 393 F.3d 767, 770-71 (8th Cir.), cert. denied, 545 U.S. 1121 (2005), we upheld stops of vehicles that had no front license plates, as Iowa requires, because, when the officer followed the vehicle, he could see an out-of-state rear plate but could not determine until the car was stopped whether the plate had been issued by a State that did not

require a front plate. In both cases, we held that the officers had reasonable suspicion the vehicles were operating in violation of Iowa law.

Three prior cases involved temporary registration documents. In <u>United States v. Sanchez</u>, 572 F.3d 475, 478-79 (8th Cir. 2009), the officer knew that a piece of paper taped to where the rear license plate should be was not a Nebraska "In Transit" sticker and could not see the name of another issuing jurisdiction; we concluded the officer had reasonable suspicion that the vehicle did not display valid proof of registration, as Nebraska law required. In <u>United States v. Mendoza</u>, 691 F.3d 954, 959 (8th Cir. 2012), <u>cert. denied</u>, 568 U.S. 1137 (2013), the officer knew that the paper tag in the vehicle's rear window was not an Iowa temporary tag; she could not identify an issuing State from fifteen to twenty feet away and thought the paper resembled fraudulent tags she had previously encountered. We concluded there was reasonable suspicion to stop the vehicle because the officer "gave particularized reasons why she suspected that this particular tag may have been fraudulently created on a printer rather than issued by an official authority." Likewise, in <u>Givens</u>, an Iowa officer stopped a vehicle displaying what appeared to be a paper registration card, but the officer could not read the card because of darkness and the angle of the windshield. The officer had been able to read other temporary cards at night, and had prior experience with invalid and fraudulent registration cards. 763 F.3d at 988. We concluded the officer had reasonable suspicion to stop the vehicle for lack of a valid registration card, noting it was "critical" that the officer "could only see what appeared to be a temporary paper registration card in the rear window, but did not know whether the paper was in fact a registration card." <u>Id.</u> at 990-91.

These cases illustrate, as the Supreme Court's governing standard demands, that the determination of reasonable suspicion is fact specific, requiring the government to establish that the officer had "a particularized and objective basis for

suspecting the particular person stopped of breaking the law." Heien, 135 S. Ct. at 536.  In this case, the government failed to do so.

Relying on Givens, 763 F.3d 987, the government argues that Officer Del Valle's inability to read the temporary registration card from her police cruiser gave her, without more, reasonable suspicion to stop the BMW.  We disagree.  First, the government's witnesses failed to identify what violation of state law the BMW operator was suspected of committing.  The statute primarily at issue, Iowa Code § 321.25, provides an exception to the requirement that visible and legible registration plates (commonly called license plates) be securely fastened to the front and back of a motor vehicle:

> A vehicle may be operated upon the highways of [Iowa] without registration plates for a period of forty-five days after the date of delivery of the vehicle to the purchaser from a dealer if a card bearing the words "registration applied for" is attached on the rear of the vehicle. The card shall have plainly stamped or stenciled the registration number of the dealer from whom the vehicle was purchased and the date of delivery of the vehicle.[2]

Officer Del Valle, who made the stop, testified that she stopped the BMW for an equipment violation based on the opinion of Officer Sullivan ("there you go"), who could not see the BMW and did not testify at the hearing.  Del Valle justified the stop because she "could not see the numbers or letters on [the] temporary registration tag which the DOT requires" from her police cruiser.  However, she knew the BMW had a car dealer's advertising plate where the rear license plate is customarily attached, and she knew the piece of paper taped to the rear window was a temporary Iowa

---

[2]Iowa Code § 321.98 provides that it is unlawful to operate a motor vehicle on an Iowa highway "unless there shall be attached thereto and displayed thereon . . . a valid registration card and registration plate or plates issued" for the current year.

registration "plate" in the form approved by the Iowa DOT.  Indeed, in her Incident Report written the day after the stop, Officer Del Valle wrote, "I observed the BMW had promotional/advertising dealer plates and I observed a paper plate affixed to the left portion of the rear window, but I was unable to see the letters or numbers on the paper plate from my vehicle."

Del Valle also did not identify what information she could not see that gave her (or Officer Sullivan) reasonable suspicion of a violation.  If her reference to "letters or numbers" meant the unique *vehicle* registration letters and numbers on a license plate, which law enforcement officers often use to identify specific vehicles, then she had no reasonable suspicion at all, because § 321.25 only requires disclosure of "the registration number of the dealer from whom the vehicle was purchased and the date of delivery of the vehicle."  If she meant the *dealer's* registration number, she did not explain why she needed to see that when she could plainly see a dealer's advertising plate in the BMW's license plate location.  If she meant the expiration date -- and nothing in the record even hints at that -- neither Del Valle nor Richter testified as to their basis for believing that the requirement in § 321.25 that this information be "plainly stamped or stenciled" on the temporary card meant that, unless it is readable at night from a pursuing police cruiser, the vehicle is likely breaking the law.[3]

Second, the government did not introduce into evidence either the temporary registration card taped to the rear window when the BMW was seized, or a copy of the standard-form Iowa DOT temporary card to which Del Valle referred in her testimony. Thus, the only evidence of record is Del Valle's contemporaneous opinion that the paper card she saw was a form of card that complied with § 321.25.  Indeed, the government does not dispute that the temporary card satisfied the requirements

---

[3]The government on appeal does not contend that Del Valle's inability to read the card from her vehicle violated the "plainly stamped or stenciled" requirement of Iowa Code § 321.25.

of Iowa law. Third, neither Sergeant Richter nor Officer Del Valle testified that they can usually read temporary cards at night or that they had previous problems with fraudulent or invalid cards. These facts distinguish this case from facts we deemed "critical" in Sanchez, Mendoza, and Givens.

As the district court recognized, the government's position in this case would mean that an Iowa police officer may stop a vehicle displaying a proper form of temporary registration card *whenever* the officer cannot read the dealer registration number and the card's expiration date from inside the officer's following police cruiser. The Fourth Circuit rejected this contention in United States v. Wilson, 205 F.3d 720 (4th Cir. 2000) (en banc), a decision we factually distinguished in Givens, 763 F.3d at 991. In Wilson, a South Carolina officer stopped the defendant's car to determine if its North Carolina temporary paper tag was valid, because the officer was unable to read the expiration date in the darkness and "the small space provided for writing in the date." 205 F.3d at 722-23. The court concluded the officer "had no suspicion at all" that the defendant was breaking the law; it was dark, both cars were moving, and there was no evidence the "tag was illegible or in any way obliterated, smudged, or faded." Id. at 723. The court noted that permitting a traffic stop under such circumstances would permit police officers to randomly stop any car with a temporary tag. "The Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags." Id. at 724. Likewise, in State v. Carmody, the Iowa Court of Appeals reversed the denial of a motion to suppress where the officer following defendant's car could see it had a temporary tag but "couldn't make out the markings on it." 2013 WL 5949621 at *2, 841 N.W.2d 356 (Table) (Iowa App. 2013) ("our jurisprudence does not recognize an unbridled cart blanche authority on the part of officers to make random investigatory traffic stops," citing Prouse, 440 U.S. at 661). We agree with these decisions and conclude, like the district court, that Wilson, not Givens, is the governing authority.

The government alternatively asserts that even if Officer Del Valle did not have reasonable suspicion to stop the BMW, she was acting under an objectively reasonable mistake of law in believing that her inability to read the card was a violation of Iowa law.  See Heien, 135 S. Ct. at 539.  Though the government did not make this argument to the district court, it was arguably encompassed by the Fourth Amendment issues debated before the magistrate judge and the district court.  But even if not forfeited, the argument that the officers made a reasonable mistake of Iowa law is without merit:  (a) it is not reasonable to construe the requirement of "plainly stamped or stenciled" information in § 321.25 as meaning information that can be read from a pursuing officer's police cruiser; and (b) the Iowa Court of Appeals decision in Carmody is directly contrary authority.  Cf. United States v. Flores, 798 F.3d 645, 649 (7th Cir. 2015).  On the other hand, if the government is arguing that Officer Del Valle (or Officer Sullivan) reasonably believed there was reasonable suspicion to make a traffic stop, "mistakes about the requirements of the Fourth Amendment violate the Fourth Amendment even when they are reasonable." Heien, 135 S. Ct. at 541 n.1 (Kagan, J., concurring, quoting the Solicitor General's *amicus* brief).

We affirm the Order of the district court in the consolidated criminal cases dated February 28, 2017.

_____