# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-2763

_____

Jared Clinton

*Plaintiff - Appellee*

v.

Ryan Garrett, individually and in his official capacity as a law enforcement officer for the Des Moines, Iowa Police Department; Brian Minnehan, individually and in his official capacity as a law enforcement officer for the Des Moines, Iowa Police Department; Ryan Steinkamp, individually and in his official capacity as a law enforcement officer for the Des Moines, Iowa Police Department; City of Des Moines, Iowa; Dana Wingert, individually and in his official capacity as Chief of Police for the Des Moines, Iowa Police Department

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: February 16, 2022
Filed: September 21, 2022

_____

Before SMITH, Chief Judge, BENTON and KELLY, Circuit Judges.

_____

SMITH, Chief Judge.

Jared Clinton's vehicle was stopped by three Des Moines police officers based on the officers' inability to read the temporary license plate tag in Clinton's back window and on a suspicious look that one of Clinton's passengers gave the officers. The officers searched the vehicle, finding evidence of marijuana. Clinton was charged with possession of a controlled substance, in violation of Iowa Code § 124.401(5); the State of Iowa, however, did not pursue prosecution.

Clinton brought suit in state court against the officers for violation of his rights under the Fourth Amendment to the Federal Constitution and under Article I, § 8 of the Iowa Constitution and for conspiracy to violate his federal and state constitutional rights. He also brought claims against the chief of police and the City of Des Moines for deliberate indifference under federal and state law. The defendants timely removed the suit to federal court.

Thereafter, Clinton moved for summary judgment on all counts except for the amount of damages; the defendants filed a cross-motion for summary judgment on the basis of federal qualified immunity and state immunity. The district court[1] entered an order deciding all claims as a matter of law but leaving the amount of damages for a jury trial. Rejecting the officers' arguments that they were entitled to immunity, the court granted Clinton's motion on his Fourth Amendment and Iowa Constitution claims against the officers. It also granted Clinton summary judgment on his state-law claim against the City. The court dismissed Clinton's conspiracy claims, his federal claim against the City, and his state and federal claims against the police chief.

On appeal, the defendants argue that the district court erred in denying the individual officers qualified immunity on Clinton's federal law claims, in denying the

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

officers state immunity on his Iowa law claims, and in denying summary judgment to the City on his deliberate indifference claim. We affirm.

## I. *Background*

On October 3, 2019, Jared Clinton was pulled over by Des Moines Police Department Officers Ryan Garrett, Brian Minnehan, and Ryan Steinkamp riding together in Officer Garrett's marked police vehicle. According to Officers Garrett and Minnehan, as Clinton's vehicle passed the patrol car, Clinton's front-seat passenger sat up quickly from a reclined position, looked at the officers in an apparently nervous manner, and sat back down quickly.[2] The officers subsequently began to follow Clinton's vehicle.

Additionally, the officers noted that Clinton's car did not have permanent license plates. Instead, the plates on Clinton's car advertised the dealership "Dewey Auto Outlet." *See* R. Doc. 35-1, at 19. Clinton had a valid temporary tag in the appropriate place in his vehicle's rear window. However, the officers were unable to "make out any writing" on it from their position behind Clinton's vehicle. *Id.* at 11. The officers "observed that the vehicle had . . . dealer plates and a white piece of paper taped in the back window. [They] followed the vehicle for several blocks and could not make out any writing on it." *Id*. According to Officer Minnehan, "mostly it [was] the angle of the back windshield and then the glare from the sun" that made the tag unreadable. *Id.* at 59. Officer Garrett similarly testified that he "could not have said" whether the tag "was blank or not blank" because "there was no way to tell" from where they were following Clinton's vehicle. *Id.* at 47. He further testified to having previously encountered forged tags because of the fact that paper tags are "easily altered." *Id*. Officer Steinkamp testified about his previous experiences with drivers placing counterfeit or blank documents in the windows of unregistered vehicles to mimic temporary registration tags.

---

[2]The officers testified to this effect at their depositions.

The officers "initiated a traffic stop . . . to verify that the paper tag was legitimate." *Id.* at 11. Officer Minnehan approached the vehicle and saw that Clinton's temporary tag was legible and that it was not expired. Officer Garrett went to Clinton's window. He testified that "he immediately detected a strong odor of marijuana coming from the vehicle." *Id.* He asked whether the car was titled in Clinton's name. Clinton asked Officer Garrett why he had been stopped. The officer said, "I'm pulling you over because I was just checking up on your ID tag, OK?" J.A. at 374 (USB drive) (Garrett Body Cam. at 2:50–3:00). Officer Steinkamp explained to Clinton that the police encounter "a lot of [temporary registration tags] that are fraudulent. We don't know that until we verify it. That's why we pulled you over." *Id.* (Steinkamp Body Cam. at 5:20–5:50). Officer Minnehan told Clinton that he had been stopped because the officers could not "read [his] paper tag" from their vehicle. *Id.* (Minnehan Body Cam. at 22:00–22:30). He also told Clinton that the officers' attention had been piqued when his passenger "looked at [them] real hard, like [he was] super nervous." *Id.* (Minnehan Body Cam. at 22:00–22:30).

In addition to observing the odor of marijuana, Officer Garrett saw what he believed to be evidence of the same on Clinton's person. Clinton told the officers that he had been smoking marijuana in the same clothing earlier that day. Thereafter, the officers searched the car and its occupants and discovered a vape pen and a vape cartridge both alleged to contain THC.

Clinton was arrested and charged with possession of a controlled substance, in violation of Iowa Code § 124.401(5). He spent approximately four hours in Polk County Jail. After Clinton filed a motion to suppress, the county attorney filed a notice of intent not to prosecute, and Clinton's criminal case was dismissed without prejudice.

On May 18, 2020, Clinton brought suit in Iowa state court against Officers Garrett, Minnehan, and Steinkamp as well as against the City and Chief of Police

Dana Wingert. Clinton's complaint asserted six claims: (1) a 42 U.S.C. § 1983 claim against the officers for violation of his Fourth Amendment rights (Count 1); (2) a claim against the officers for violation of his rights under Article I, § 8 of the Iowa Constitution (Count 2); (3) a claim against the officers under 42 U.S.C. §§ 1983 and 1985 for conspiracy to violate his rights under the Fourth, Fifth, and Fourteenth Amendments (Count 3); (4) a claim against the officers for conspiracy to violate Article I, §§ 6 and 8 of the Iowa Constitution (Count 4); (5) a claim against the chief of police and the City of Des Moines under 42 U.S.C. § 1983 for deliberate indifference (Count 5); and (6) a claim against the chief of police and the City for deliberate indifference under Article I, §§ 6 and 8 of the Iowa Constitution (Count 6). The defendants timely removed the case to federal court.

Clinton moved for partial summary judgment as to all claims except for the amount of damages. The defendants filed a cross-motion for summary judgment based on federal qualified immunity and state-law immunity.

The district court granted Clinton's motion as to Counts 1 and 2, denied his motion as to Counts 3, 4, and 5, and granted his motion for summary judgment only as to the City on Count 6. The court granted the defendants' motion as to Counts 3, 4, and 5 and granted only as to Chief Wingert on Count 6. The court scheduled a jury trial on the amount of damages.

## II. *Discussion*

On appeal, the defendants argue that the district court erred in denying the officers immunity as to Counts 1 and 2 and in granting summary judgment to Clinton as to the City on Count 6.

## A. *Jurisdiction*

We first address whether we have jurisdiction to hear this appeal. Section 1291 of 28 U.S.C. confers jurisdiction on federal circuit courts to hear "appeals from all

final decisions of the district courts." "Generally speaking, appeal must await the terminating order—the decision that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Langford v. Norris*, 614 F.3d 445, 454 (8th Cir. 2010) (internal quotation marks omitted). Here, the district court decided all counts as a matter of law and ordered a jury trial to determine the amount of damages. As the court left the issue of damages for the jury, litigation is ongoing and its order is not a final decision under § 1291. *Maristuen v. Nat'l States Ins. Co.*, 57 F.3d 673, 678 (8th Cir. 1995) ("A judgment awarding damages but not deciding the amount of the damages . . . is not a final decision within the meaning of § 1291."); *Laclede Gas Co. v. Amoco Oil Co.*, 531 F.2d 942, 943 (8th Cir. 1976) (per curiam) (holding that a district court's order resolving all claims except the amount of damages was not final and appealable); *Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 516 F.2d 846, 849 (8th Cir. 1975) (holding that an order deciding liability but leaving damages for later determination was not final).

### 1. *Federal Law Claims*

Interlocutory appeals before litigation is final are allowed only in special cases:

> Ordinarily, we lack jurisdiction to hear an immediate appeal from a district court's order denying summary judgment, because such an order is not a final decision. We do, however, have limited authority to review the denial of qualified immunity through an interlocutory appeal under the collateral order doctrine. Our jurisdiction to review the denial of qualified immunity extends only to abstract issues of law, not to determinations that the evidence is sufficient to permit a particular finding of fact after trial. Thus, a defendant entitled to invoke a qualified immunity defense may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial. And we typically may not consider any other grounds for granting summary judgment on the merits of the case at this interlocutory stage.

-6-

*Langford*, 614 F.3d at 455 (cleaned up).

We conclude that jurisdiction is present to consider the defendants' appeal of the district court's denial of qualified immunity as to Clinton's federal claims. *Id.*

### 2. *State-Law Claims*

Pendent jurisdiction is available for state-law "claims that are 'inextricably intertwined' with interlocutory appeals concerning the defense of qualified immunity," which requires them to be "coterminous with, or subsumed in" our qualified immunity analysis. *Veneklase v. City of Fargo*, 78 F.3d 1264, 1269–70 (8th Cir. 1996) (quoting *Kincade v. City of Blue Springs*, 64 F.3d 389, 394–95 (8th Cir. 1995)). Iowa state immunity does not meet that test in this case. It does not require us to determine whether the defendants violated a "clearly established right" and, as it imposes a higher standard of care, it affords less protection than does qualified immunity. *See Baldwin v. City of Estherville*, 915 N.W.2d 259, 281 (Iowa 2018) ("[W]ith respect to a damage claim under article I, sections 1 and 8, a government official whose conduct is being challenged will not be subject to damages liability if she or he pleads and proves as an affirmative defense that she or he exercised *all due care* to conform to the requirements of the law." (emphasis added)). Thus, pendent jurisdiction is unavailable as to the issue of state-law immunity.

*Langford* concerned an interlocutory appeal of a district court's denial of the defendants' motion for summary judgment on the basis of federal qualified immunity as well as immunity under Arkansas law. 614 F.3d at 455. We held that we had jurisdiction over both issues. As to state immunity, we observed that "[u]nder Arkansas law, the denial of statutory immunity is immediately appealable, for as the Arkansas Supreme Court has explained, 'the right of immunity from suit is effectively lost if a case is permitted to go to trial.'" *Id.* (quoting *City of Fayetteville v. Romine*, 284 S.W.3d 10, 13 (Ark. 2008)).

The Iowa Supreme Court, however, has not addressed this issue. Rather, for this court to have jurisdiction, the defendants would have had to seek certification pursuant to 28 U.S.C. § 1292(b). Failure to do so is fatal to our jurisdiction on Counts 2 and 6. *See Langford*, 614 F.3d at 454. For this reason, we dismiss the appeal as to those claims for lack of jurisdiction.

## B. *Qualified Immunity*

Having decided the matter of jurisdiction, we now turn to the question of whether the officers are entitled to federal qualified immunity.

In general, we review de novo a district court's grant of summary judgment. *Dahlin v. Lyondell Chem. Co.*, 881 F.3d 599, 603 (8th Cir. 2018). A district court's denial of summary judgment based on qualified immunity is likewise reviewed de novo. *Thurmond v. Andrews*, 972 F.3d 1007, 1011 (8th Cir. 2020). In conducting our review, we view the record and make all reasonable inferences in favor of the nonmoving party. *Id*.

Section 1983 creates a cause of action for the alleged constitutional violations of government actors. However, "[q]ualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996). An officer is entitled to qualified immunity if two elements are met. First, the court asks, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Next, the court asks "whether the right was clearly established." *Id*.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a seizure within the meaning of the Fourth

-8-

Amendment and, as such, must be supported by reasonable suspicion or probable cause." *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008). In determining whether reasonable suspicion exists, we "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Additionally, we "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 750–51 (quoting *Cortez*, 449 U.S. at 418). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417.

Iowa law mandates display of both front and rear license plates. Iowa Code § 321.37. However, it affords an exception "for a period of forty-five days after the date of delivery of the vehicle to the purchaser from a dealer if a card bearing the words 'registration applied for' is attached on the rear of the vehicle." *Id.* § 321.25(1). Iowa law further requires that such temporary registration tag "have plainly stamped or stenciled the registration number of the dealer from whom the vehicle was purchased and the date of delivery of the vehicle." *Id*. It constitutes a misdemeanor under Iowa law to operate a vehicle without either a valid permanent license plate or a valid temporary tag. *Id.* § 321.98(2). Iowa law further proscribes falsification of a temporary tag. *See id.* §§ 321.100, 714.8(11).

To stop a driver for a suspected temporary-tag violation, police must have "articulable and reasonable suspicion that a motorist is unlicensed or that an

automobile is not registered." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Despite the states' "vital interest in ensuring that only those qualified to [drive] are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed," *id.* at 658, the Fourth Amendment does not permit random "spot checks," *id.* at 661. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

It is undisputed that Clinton's temporary tag complied with Iowa law. *Clinton v. Garrett*, 551 F. Supp. 3d 929, 938 (S.D. Iowa 2021) ("A properly completed temporary registration tag was taped in Clinton's rear window."). The issue is whether the officers had a reasonable and articulable suspicion that Clinton was violating the law. The district court found that they did not, reasoning that the inability to make out the tag did not constitute "a particularized basis for believing a motor vehicle was unregistered or a temporary registration tag was falsified." *Id.* at 940. The court based its conclusion on the distinction between an absence of information about the tag, i.e., the officers' inability to see what was on the tag, and the presence of some information that pointed to the tag being fake.

Clinton argues, and the district court concluded, that *United States v. McLemore*, 887 F.3d 861 (8th Cir. 2018), is controlling. In *McLemore*, we held that no reasonable suspicion existed for a stop based on an officer's inability to read the temporary tag taped inside the vehicle's rear window. There, Officer Diana Del Valle saw a vehicle with

> a dealer advertising plate instead of a rear license plate . . . and a temporary paper card taped to the inside of the left rear window. Del Valle radioed [Officers] Richter and Sullivan [that] she had seen "no violations yet." They asked about the card in the back window. Del Valle said, "you can see a plate, but you can't read what's on it." Officer

Sullivan replied, "there you go." Del Valle activated the lights on her police cruiser and made an "equipment stop."

*McLemore*, 887 F.3d at 863–64. We focused on the fact that Officer Del Valle relied on her inability to read the tag—rather than on her observation of a possible legal defect on the tag—in deciding to stop the vehicle:

> Del Valle justified the stop because she "could not see the numbers or letters on [the] temporary registration tag which the DOT requires" from her police cruiser. However, she knew the BMW had a car dealer's advertising plate where the rear license plate is customarily attached, and she knew the piece of paper taped to the rear window was a temporary Iowa registration "plate" in the form approved by the Iowa DOT. Indeed, in her Incident Report written the day after the stop, Officer Del Valle wrote, "I observed the BMW had promotional/advertising dealer plates and I observed a paper plate affixed to the left portion of the rear window, but I was unable to see the letters or numbers on the paper plate from my vehicle."

*Id.* at 866 (alteration in original). Additionally, we discounted the fact that the stop occurred in a high-crime area, concluding that more was needed to provide reasonable and articulable suspicion. *Id.* at 863 (noting that police first saw the BMW in "a high[-]crime neighborhood . . . parked at . . . a residence frequented by members of one of two rival gangs"). This is in keeping with longstanding Supreme Court precedent requiring "objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417.

*McLemore* stands for the proposition that it is a constitutional violation to stop a vehicle merely because it has a temporary tag without a particularized basis for suspecting the tag is in violation of Iowa law. *McLemore*, 887 F.3d at 867 (noting that the use of a temporary tag alone to justify a stop "would permit police officers to randomly stop any car with a temporary tag."). But the officers argue that the instant

case is more in line with several other Eighth Circuit cases. In *United States v. Mendoza*, the arresting officer had recently investigated fraudulent temporary tags and credibly testified that she believed the temporary tag was forged because (1) it lacked "the colors of an Iowa temporary tag," (2) "she saw 'blue bars of some kind' on the tag, but she did not recognize the colors, and [(3)] she observed that she 'couldn't verify that it was a legitimate tag and not something that someone had made on their printer.'" 691 F.3d 954, 957 (8th Cir. 2012). In *United States v. Sanchez*, an officer stopped a minivan driving without a front license plate and "a piece of paper affixed to the minivan where a rear license plate would have been displayed." 572 F.3d 475, 476 (8th Cir. 2009). Although it turned out to be a compliant Arizona temporary tag, the officer could tell before pulling the defendant over that the rear plate was not compliant with Nebraska law. *Id.* at 478–79. In both cases, the officer, before making the stop, reasonably believed that the temporary tag was fake or noncompliant. Moreover, in both cases, the officers had specific, articulable facts that led them to that conclusion.

In particular, the officers argue that the present facts most closely parallel *United States v. Givens*, 763 F.3d 987 (8th Cir. 2014). There, we concluded that it was "objectively reasonable for Officer Baughan to expect that a properly displayed valid registration card would be readable from his location" based on the fact that he "credibly testified that his suspicion arose because he could not determine whether the paper affixed to the rear window was a valid temporary registration card" and "that he had on prior occasions been able to read temporary registration cards at nighttime." *Id.* at 990. "Without an opportunity to inspect the paper closely, [Officer Baughan] could not eliminate the possibility that the [vehicle] did actually display valid proof of [ ] registration." *Id.* at 991 (alterations in original) (quoting *Sanchez*, 572 F.3d at 479). In so concluding, we placed special emphasis on the officer's inability to determine whether the temporary tag was indeed what it appeared to be:

The district court, in adopting the report and recommendation of the magistrate judge, expressly found that Officer Baughan, before stopping the vehicle, could only see what appeared to be a temporary paper registration card in the rear window, but did not know whether the paper was in fact a registration card. This finding is critical, particularly because we have previously upheld a traffic stop under conditions where a vehicle did not display a metal license plate and the officer saw only what appeared to be a paper tag posted in the rear window, but did not know whether the paper affixed to the window was a valid registration tag.

*Id.* at 990 (citing *Mendoza*, 691 F.3d at 959).

In distinguishing the present facts from *Givens*, the district court observed that "Officer Garrett admitted to initiating the stop 'strictly' because the officers 'couldn't see' what was on Clinton's temporary tag and not because of a mistaken, affirmative belief that the tag was blank or fraudulent." *Clinton*, 551 F. Supp. 3d at 942. Additionally, to the extent that any of the officers held a genuine belief that the tag was falsified, such a belief was unreasonable. In *Givens*, it was "undisputed that Officer Baughan observed a vehicle *with no metal license plates* and that he could see what appeared to be a paper registration card in the rear window of the car but could not read it due to the angle of the rear window and the fact that it was dark outside." *United States v. Givens*, No. 12-CR-55-LRR, 2012 WL 6738400, at *3 (N.D. Iowa Dec. 31, 2012), *aff'd*, 763 F.3d at 987 (emphasis added). Here, however, the officers observed "what appeared to be a paper registration card," *id.*, as well as a dealer advertisement plate and a matching decal next to it, R. Doc. 35-1, at 19. On these facts, the natural and reasonable conclusion would have been that the car was a recent purchase and that its temporary tag was likely valid. Even combined with the fact that the stop occurred in an area known for criminal activity as well as a momentary display of nervousness on the part of a passenger, there is not enough here to justify the stop. *See McLemore*, 887 F.3d at 866; *United States v. Beck*, 140 F.3d 1129, 1137 (observing that "concrete reasons" are necessary for "wholly innocent factors to

-13-

combine into a suspicious conglomeration" (internal quotation marks omitted)). Accordingly, we conclude that the officers violated Clinton's rights.

We must still determine whether that right was clearly established. For the right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Buckley v. Rogerson*, 133 F. 3d 1125, 1128 (8th Cir. 1998) (internal quotation marks omitted). The burden falls on the party asserting qualified immunity to establish the relevant predicate facts. *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). "We do not define clearly established law at a high level of generality. Rather, we look for a controlling case or a robust consensus of cases of persuasive authority." *Thurmond*, 972 F.3d at 1012 (internal quotation marks and citation omitted).

The officers argue that there is no clearly established right to drive with a nervous passenger through a high crime neighborhood with a temporary tag that is unable to be read by officers following the vehicle. We have already dismissed this argument to the extent that it relies upon Clinton's nervous passenger and the area where he was driving. These facts, in isolation, do not support a conclusion that Clinton's vehicle was connected to unlawful activity in general, much less to the specific kind of unlawful activity for which the officers pulled him over—a possible temporary tag violation. Nor can a driver rightly be held responsible for ambient conditions that render a tag illegible. *Compare McLemore*, 887 F.3d at 866 (holding reasonable suspicion did not exist when officer's sole reason for the stop was an inability to read a valid temporary registration tag), *with Givens*, 763 F.3d at 990 (holding an officer's stop of a vehicle passes constitutional muster when he observed a car driving with no license plates but was unable to read its temporary registration and he credibly testifies that he is usually able to do so under similar conditions). The authority is clear: officers must have particularized facts that give rise to reasonable suspicion in order for a stop to be constitutionally valid. *See McLemore*, 887 F.3d at 866; *Mendoza*, 691 F.3d at 959; *Sanchez*, 572 F.3d at 479*; see also Beck*, 140 F.3d

-14-

at 1137; *Prouse*, 440 U.S. at 661. The officers cannot point to any positive indicator for their suspicion that Clinton's tag was falsified. The few indicators present, e.g., Clinton's dealership plates, point the opposite direction. *Cf. Givens*, 763 F.3d at 990. By the clearly established law, this court "cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000).

For these reasons, the officers' stop of Clinton's vehicle constituted a violation of his clearly established rights. Hence, the district court did not err in concluding that they were not entitled to qualified immunity. And since the stop constituted a violation of Clinton's Fourth Amendment rights, the court did not err in granting summary judgment to Clinton.[3]

### III. *Conclusion*

Accordingly, we affirm the district court.

_____

[3]The officers also argue that they were acting on the advice of attorneys that the stop was valid. The officers' subjective opinions about the constitutionality of their actions have no bearing on qualified immunity analysis. *See Conrod v. Davis*, 120 F.3d 92, 97–98 (8th Cir. 1997).